DOMENGEAUX, Judge.
This is an action in which plaintiff tenant seeks damages from the defendant lessor allegedly resulting from the illegal en *507 try and repossession by defendant of the rented premises, and his destruction of plaintiff’s furniture and personal effects contained therein. Defendant reconvened against plaintiff for damages to his property and for unpaid rent. Following a trial on the merits, the trial court rendered judgment awarding plaintiff the sums of $100.00 for the destruction of her property and $200.00 for the unlawful entry, and awarding defendant the sums of $350.00 for damage to the premises and $50.00 for past due rent. Plaintiff appealed the judgment and defendant answered her appeal, both parties seeking an increase in their awards.
The record discloses that in or about the month of April, 1967, one Will Wright, uncle of the plaintiff herein, rented a residence owned by defendant and located in a rural area near Lecompte, Louisiana, for an agreed rental of $50.00 per month. The following month the plaintiff and her three children moved into the house, since he had rented it for them. Nevertheless he continued to pay the rent for several months thereafter until plaintiff, finding herself in improved economic circumstances, began paying the rent herself. Although the rent was due on the first day of each month, by custom and with the acquiescence of defendant, it was paid on the sixteenth day of each month, for the month then running, to an agent of defendant. All was in harmony until the month of July, 1968.
On or about the first day of that month the plaintiff was taken ill and she entered Huey P. Long Charity Hospital in Pine-ville, Louisiana, where she remained for three days. Upon her release from the hospital she found it necessary to move in temporarily with her mother in order to be near the hospital for treatment and to have her children cared for during her illness. It was in the remainder of July, while plaintiff was living with her mother, that the occurrences giving rise to this litigation took place.
The plaintiff testified that she left the premises to go to the hosiptal on July 1, 1968. She locked the doors and put down the windows, two of which were cracked. She described the contents of the house, when she left it, this way: “ * * * I had a refrigerator, stove, dishwasher, dinette, four chairs, table, dishes, pots and pans in the kitchen. In the living room I had two living room suites, studio couch, double twin bed, hide-away bed, two end tables, two coffee tables, round antique table which set in the big picture window and chest of drawers, dressers and in three bedrooms, then my clothes and shoes and other things I had.” All of these things were, she said, in good condition, and had cost her some $3,000.00. To support her testimony, plaintiff offered two mortgages on the said furniture, one dated June 23, 1966 for $1407.36 and the other dated January 11, 1968 for $720.00.
Following her release from the hospital on July 4, 1968 she went to live at her mother’s home, which we gather, was near the hospital. She states that this move was necessitated by her lack of transportation with which to return to the hospital for treatments and the need to have someone care for her children. She removed nothing from the house she was renting, save a few items of clothing for herself and her children. On July 11, 1968 she returned to the house to check on her belongings and found everything to be just as she left it except that the utilities, which had been on when she left on the first, were then cut off. She said that on July 17, 1968 she telephoned defendant’s agent to whom she had been paying the rent each month on the sixteenth, notified her of her illness, assured her that the July rent would be forthcoming, though late, and gave her the address where she could be reached. The agent, due to the fact that she was an inmate in a nursing home at the time of trial, did not testify. Finally toward the end of July, 1968 plaintiff asked her uncle to check on the house and he informed her that he had seen her possessions being carried out of the house and burned. Hence this lawsuit,
*508 Plaintiff produced her uncle, Mr. Wright, who with some discrepancies, corroborated her account of the events. He testified that he used the house in question as his mailing address and would therefore go there each Thursday to pick up his unemployment check. He stated that when he went to the house on the first Thursday of July everything seemed to be in order. On the second Thursday, July 11, the front door was missing from the house, but nothing was amiss inside the house. On the third Thursday, July 18, he went to the house with two acquaintances, L. B. Christian and Buddy Kirk, and found two men removing the furniture from the house and burning it. He said that he asked them not to burn it, but to allow him time to contact the plaintiff so she could remove it. They responded that they were under orders from the defendant to burn the furniture and proceeded to do so. Mr. Wright waited until his check arrived and then went to the plaintiff and related what had transpired. He identified the burned furniture as coming from the living room and bedrooms of the house, and also identified two men present in the courtroom as those that did the burning. The two men who were with him corroborated his version of the burning incident.
Plaintiff also called one Mr. Dufour, assistant branch manager of the mortgagee company on the aforementioned mortgages. He testified that the furniture listed on both mortgages was the same, and that he inventoried and appraised it for purposes of the loans. He also stated that he had gone to plaintiff’s residence, the home in question, in January, 19)58, and that at least all of the major items were in the house at that time. It is of some significance, however, that on the second of these mortgages, endorsers were required.
Defendant testified that around the 15th or 16th of July, 1968 he went to the house and found the front door open and the lock on it jimmied to the point of uselessness. He walked around the house and looked in the windows, all of which were open. Inside he saw furniture in the living room which some dogs present in the house had apparently damaged, and other furniture in the bedrooms. Also there was clothing hanging in the closets. Everything, he said, was covered with roaches, so he did not enter the house but only left a note on the door asking plaintiff to contact him. He returned the following day with some insecticide and sprayed it inside the house through the windows, left another note asking plaintiff to contact him, and left. He noted on that occasion that there were perhaps a dozen notices from a furniture company asking plaintiff to contact it. Defendant stated that on either his second or third visit he found the front door removed from the house, and he therefore nailed a piece of sheet metal on the opening to keep the dogs out of the house. He sprayed the house a second time in the same fashion and finally around the 21st of July he entered the house. He described the condition of the house on that occasion as follows :
“ * * * I inspected the house, in the kitchen there was rat droppings on the sink and the kitchen cabinet, there was— I went to the bathroom, the commode was filled to the brim and overflowing, there was a number of little — in the bedroom there were a number of cans they had used that had human waste in it, the walls of the house were absolutely smoked black, there was holes in the hall in particular where I had to replace entire sheets of sheetrock in the hallway and all the rest of the house had — every room had just a couple of dozen big holes that had been knocked through it.”
“ * * * The screens had been knocked out, most of them were on the ground, there were five windows in the living room that had been knocked out from the inside, in other words when you knock a glass out you can tell whether it’s been hit from the inside or the outside, had been broken out from the inside.”
*509 “ * * * The floors were covered with rubble, there was glass, rags, parts of clothes, dresses, the whole thing you had to go in there with a shovel to start off with and then finally they got to where they could sweep it out.”
“ * * * The first time I looked in the house there was some furniture in all three bedrooms and there was clothing in the clothes closets.”
“ * * * The clothing was hung up. The next time I went back, all the clothing had been removed from the clothes closets. Then the next day I went back and all the bedding and everything of any value had been removed from the house, there wasn’t — the entire thing, it had absolutely no value what was left in the house * * * ”
Defendant said that after repeated unsuccessful efforts to contact plaintiff at places where she had worked and by leaving notes on the house, he had his employees clean the premises, burning the furniture and removing the appliances to his warehouse, and then repair the house. The cost of repairing the house as shown on defendant’s reconventional demand was $350.00.
Defendant called two boys who had worked for him cleaning the house. These apparently were the two that plaintiff’s uncle and his friends saw burning the furniture, but they denied having seen Mr. Wright or his friends at the house. Although their testimony varied in regard to what furniture they removed from the rented premises and its location thereon, they generally substantiated the defendant’s statements.
To impeach plaintiff’s testimony that there was utilities service to the house in early July, defendant presented the testimony of the local manager for Central Louisiana Electric Company. He stated that his company serviced the house in question, that the account was in the name of Will Wright, Jr., and that the utilities were disconnected on June 17, 1968 for non-payment.
Another of defendant’s witnesses was the credit manager for a furniture company which had sold a television set to plaintiff. He testified that he went to the house in search of plaintiff on July 13, 1968 and again on July 21, 1968. Both times his guest was unsuccessful and he left notices asking plaintiff to contact him. His recollection of the condition of the house and of the furniture therein was generally corroborative of defendant’s testimony, except that he believed the door to be slightly open on both of his visits and he said nothing about the doorway being covered by sheet metal.
Finally defendant called the carpenter that repaired the house for him. He stated that he went to the house in the middle of July, 1968 with the defendant. He generally agreed with the defendant’s description of the premises but added that several of the plumbing fixtures were disconnected. His wages for the repair of the house, he said, amounted to $160.00.
Articles 4701 and 4703 of the Code of Civil Procedure, the statutes applicable to defendant’s eviction of plaintiff, provide as follows:
Art. 4701.
“When a lessee’s right of occupancy has ceased because of the termination of the lease by expiration of its term, action by the lessor, non-payment of rent, or for any other reason, and the lessor wishes to obtain possession of the premises, the lessor or his agent shall cause written notice to vacate the premises to be delivered to the lessee. The notice shall allow the lessee not less than five days from the date of its delivery to vacate the leased premises.”
“If the lease has no definite term, the notice required by law for its termination shall be considered as a notice to vacate under this article. If the lease has a definite term, notice to vacate may be *510 given not more than thirty days before the expiration of the term.”
Art. 4703.
“If the premises are abandoned or closed, or if the whereabouts of the lessee or occupant is unknown, all notices, process, pleadings, and orders required to be delivered or served on the lessee or occupant under this Title may be attached to a door of the premises, and this shall have the same effect as delivery to, or personal service on, the lessee or occupant.”
It is clear from these articles that when a lessee’s right of occupancy has ceased for any reason whatsoever, the lessor, in order to regain possession of the premises, must give the lessee written notice to vacate within not less than five days, and that if the premises are abandoned or closed, or if the whereabouts of the lessee are unknown, the notice may be served by attachment to the door of the premises. By his own testimony, defendant never gave plaintiff notice to vacate the premises, but only notified her to contact him. Thus he was not in compliance with the law of eviction as set forth herein-above. He committed an illegal entry, and was correctly held by the trial court to be liable for damages therefor. Mena v. Barnard, La.App., 113 So.2d 332. Considering prior awards the sum of $200.00 seems neither excessive nor inadequate to us. Rivers v. Tessitore, La.App., 165 So.2d 888; and cases cited therein.
With regard to defendant’s recon-ventional demand, we agree with plaintiff’s contention that defendant failed .to prove that the damage to the house was the result of plaintiff’s negligence. However the burden of proof was not on defendant, but rather was on plaintiff. Ordinarily, once a landlord shows damage to the leased premises, the burden of exculpating himself from negligence causing the damage falls on the lessee. La. Civil Code, Art. 2721; Ferguson v. Smill, La.App., 183 So. 600. As is evident from the foregoing discussion, plaintiff failed to carry this burden and the trial court therefore did not err in holding her liable to defendant for the damages that he claimed and actually proved, $350 for wages and materials. Defendant also proved his claim for one month of past due rent and was properly awarded the sum of $50.00 therefor. Although it was established that the grass surrounding the house was exceedingly high when defendant took possession of the premises, he failed to offer evidence of his expenditures, if any, in having it cut. This item of damages was therefore properly refused by the trial court.
Finally we come to the issue of quantum in regard to the property of plaintiff which was destroyed by defendant’s agents. The evidence concerning the value of the property is extremely contradictory and unsatisfactory, showing only that some items of furniture and clothing were burned, but being inconclusive as to their nature, number or quality. Under such circumstances the trial judge is vested with considerable discretion in the assessment of damages, and his award will not be disturbed on appeal unless it appears that he abused that discretion. Trahan v. Florida Gas Transmission Co., La.App., 208 So.2d 550; Hebert v. Pierrotti, La.App., 205 So.2d 888. We do not think that the trial court’s award of $100.00 for this item is manifestly abusive.
There was evidence introduced, however, which proved that defendant’s agents removed a number of appliances from the house and placed them in storage. Defendant in fact admitted his seizure of an apartment-type cooking stove, a refrigerator, and a dishwasher, and he produced these appliances at the courthouse on the day of the trial nearly one year later. This factor of the case was overlooked by the trial judge; perhaps it was inadvertence. The seizure by defendant of plaintiff’s appliances without resort to legal action was as wrong as his *511 destruction of her other property, and he must therefore return the seized items to plaintiff. Furthermore plaintiff is entitled to damages for the wrongful seizure and detention of her appliances and we think an award of $100.00 is justified.
For the foregoing reasons, the judgment of the trial court is amended so as to order defendant to return the appliances which he seized from plaintiff, and to pay plaintiff the additional sum of $100.00 in damages for the wrongful seizure and detention thereof, and as so amended, is affirmed. Each of the parties is to bear one-half of the costs both in the trial court and for this appeal.
Amended and affirmed.